Susanna Librandi
Plaintiff in Propria Persona
15 Mead Farm Rd
Seymour, CT 06483
203.494.1844
Susanna411@gmail.com

SEP 7 2022 AM 11:49
FILED-USDC-CT-NEW HAVEN

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
141 Church Street, New Haven, CT 06510

SUSANNA LIBRANDI

    PLAINTIFF

v.

    CASE NO. 22 CV 1126 (MPS)

ALEXION PHARMACEUTICALS, INC.

    DEFENDANT

_____/

## COMPLAINT FOR DISCRIMINATION, RETALIATION, AND PROHIBITED ACTIONS ON THE BASIS OF DISABILITY

Susanna Librandi ("plaintiff"), sues the ALEXION PHARMACEUTICALS, INC. ("defendant") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

## PARTIES

1.    The plaintiff receives mail in Seymour, Connecticut at the address of 15 Mead Farm Road for all times material to the facts giving rise to the complaint.

2.    The defendant is an "employer" within the definition of 42 U.S.C. 12111(5), with its principal place of business at 121 Seaport Blvd, Boston, MA 02210 for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

3.     This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Part 1630.14(b)(3), (c) and (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

4.     Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

5.     The plaintiff timely filed a charge of discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on May 27, 2022. The plaintiff has exhausted all administrative remedies and obtained her right to sue letter from the EEOC within the ninety days preceding the date on which she commenced her original complaint against the defendant. A true and correct copy of the EEOC's right to sue letter is alleged and included as Exhibit A.

6.     The plaintiff has exhausted all administrative remedies available to her.

## BACKGROUND

7.     Since 2021, the defendant adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical masks, take experimental vaccines, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

8.     The defendant admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease. The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees. No provisions exist to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

**9.** Likewise, no provisions have been made to authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is voluntary. In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism. The policy thus relies upon the voluntary compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-job-related medical inquiries or treatments. A voluntary policy is not a legitimate requirement.

**10.** One of the mitigation measures established by the defendant's "Covid-19 Policy" is a vaccination mandate. On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no exemption. The defendant's policy treated the last group of employees (as opposed to the other employees that complied with the "Covid-19 Policy" or exempted themselves from it) either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or suppressed immune system that made them prone to contracting Covid-19.

**11.** It should also be noted that no provisions were included to handle employees who did not volunteer to waive their rights and who claimed exception to the defendant's "Covid-19 Policy". The policy thus failed to acknowledge the existence of qualified individuals who claimed their rights under disability law and therefore are not subject to the same requirements as the rest of the employees.

**12.** The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population. The defendant's "Covid 19 policy" imposed these measures upon all of its workers without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

**13.** Notwithstanding the lack of enforceability, the defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference towards employees, such as the plaintiff, who took exception to the policy partly because the practices were unrelated to the performance of essential job functions[1].

---

1 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ….the reason the position exists is to perform that function."

**14.**    Medical decisions are far beyond the scope of the employer-employee relationship. The policy asks representatives of employers to make repeated, non-job related medical inquiries of employees and to impose non-job-related medical treatments on them.

### STATEMENT OF FACTS

**15.**    The plaintiff has been an employee of Alexion Pharmaceuticals, Inc since June 16th, 2008, and has received positive work assessment for the past ten years.

**16.**    In July of 2021, Alexion Pharmaceuticals, Inc was acquired by AstraZeneca. One month later, the defendant began imposing a "Covid-19 Policy" which asked for documented "Covid-19 vaccine" information from all employees, despite the fact that office staff were scheduled to work remotely until March 14th, 2022. The defendant claims its policy follows CDC and state authorities' guidance.

**17.**    In September of 2021, the plaintiff was directed to enter her "vaccine status" on a web portal site the company used to have employees enter their "vaccine status" or else to check one of the available "non-disclosure reasons".

**18.**    At that moment, the plaintiff was not aware that she did not have to give the defendant non-job-related medical information. The defendant only informed her that she could request an exemption.

**19.**    The plaintiff made inquiries regarding the protections a "religious exemption" would give her against her employer's "Covid-19 Policy", which she opposed. The plaintiff is concerned about the security of her private health information since she had to send many emails outside of the supposedly "secure SmartSheet" portal being used to collect the "vaccination information", in order to get her questions answered. The plaintiff tried to get some information from Lisa Rahilly, the Global Employment attorney, who confirmed that "religious" was a legally protected status for which the defendant would "need to provide an accommodation process". Based on her advice, the plaintiff requested a "religious exemption". At that moment, the plaintiff considered that said avenue best expressed her reasons for opposing a policy which asked for non-job-related medical interventions and non-job-related medical information.

**20.**     On November 24th, 2021, the plaintiff submitted an "Affidavit for declination of offer of medical procedures" as her written request for a "religious exemption". However, she received written warnings of discipline despite having filed a religious exemption.

**21.**     On December 21st, 2021, the plaintiff received notice that in response to her request for a "religious exemption" the company determined that, while she would not be required to get a "Covid-19 vaccine", enter her "vaccine status", use masks or "test" during this time, she would continue to work remotely through January 21st, 2022, because without her compliance with these mitigation measures she was considered a threat to the safety of others.

**22.**     The defendant extended its imposed work-from-home requirement through February 21st, 2022 and again until April 30th, 2022.

**23.**     During the months of March and April of 2022, the plaintiff was not allowed to attend team meetings and work-related social gatherings because she was not allowed on site. This isolation and segregation had a negative impact on her career advancement, since she missed several face-to-face opportunities for meetings with my direct reports, counterparts and senior leadership. The plaintiff also missed several team building opportunities.

**24.**     On May 6th, 2022, a week after the plaintiff's "accommodation" expired, she received an unsigned notice that her employment would be terminated "for cause" on June 17th, 2022 unless she tested regularly when she returned to work in-person on June 6th, 2022.

**25.**     The defendant was requiring weekly "PCR" testing of employees who, as the plaintiff, were not fully vaccinated and held that granting an exemption from that measure would impose an undue hardship, without providing any facts or evidence.

**26.**     On May 9th, 2022, the defendant reinstated the mandatory in-office mask requirement.

**27.**     After these events, the plaintiff understood that the "religious exemption" did not protect her rights to refuse non-job-related medical inquiries and treatments.

**28.**     Plaintiff also realized that the "Covid-19 Policy" regarded her as an infectious threat that needed to comply with mitigation measures in order to work around people.

**29.**     After researching the company's anti-discrimination policy, the plaintiff found that the defendant was aware of its legal duties under the ADA.

**30.**     During April and May 2022, the plaintiff researched information about the ADA, and began to realize that she had been deceived and coerced by her employer into thinking that a religious or medical exemption were the only ways to opt-out of the defendant's "Covid-19 Policy".

**31.**     The plaintiff sent the defendant a written notice that stated that she was claiming employment discrimination and harassment based upon disability. She claimed that the defendant's policy (1) regarded her as having a contagious disease without any diagnosis or individualized assessment, and (2) made a record of such disability by mis-classifying her as having, in ADA terms, a mental or physical impairment that substantially limits one or more major life activities.

**32.**     The plaintiff stated that the defendant's policy was also using coercion, harassment and retaliation to make her submit to non-job-related medical examinations and interventions.

**33.**     The plaintiff stated that she did not waive her right to informed consent. She also claimed her employer had called her a "safety threat", as if she had an actual or potential contagious disease. The plaintiff stated that she was documenting acts of discrimination and harassment of which she has been subjected to on the job.

**34.**     On May 19th, 2022, the plaintiff held a meeting with Clarisse Wood, a Human Resources business partner. Plaintiff asked to review the records her employer had relied upon to determine that she was a direct threat, but the defendant failed or refused to provide these records.

**35.**     Plaintiff also asked to be provided with the legal authority the defendant and its "Covid-19 Policy" were relying upon to override her rights under the ADA. The plaintiff told the HR business partner that she valued her job and was as capable and qualified as before. She stated that she only wanted to do her job without this discrimination and harassment regarding my personal and private medical choices and health information. The plaintiff asked the HR business partner for help to stop the discrimination and harassment.

**36.** On said meeting, the plaintiff told the HR business partner that because of the threats and harassing emails, she had been experiencing extreme stress resulting in migraine headaches, gastrointestinal distress, and loss of sleep and appetite, especially since the letter threatening her termination.

**37.** That same day, in response to the defendant's requests that the plaintiff comply with the testing requirement, the plaintiff sent another notice claiming her right not to take non-job-related medical inquiries or tests.

**38.** The plaintiff asserted that she was not waiving her rights under the ADA, and that she was fit for work. She also reaffirmed that the defendant was regarding her as having a disability.

**39.** On May 20th, 2022, the "Accommodations Team" sent the plaintiff an email claiming that the only ADA accommodation available to her was to ask for a medical accommodation and was given a medical questionnaire to be filled out by her doctor.

**40.** On May 31st, 2022, the plaintiff had a meeting with company's ADA compliance agents Dan Hewitt, Head of Employee Relations and Amy Larocque, Employee Relations via video-conference. She explained that she was claiming her rights under the ADA and made them aware that working from home was never her choice, rather it was isolation imposed by the company.

**41.** The plaintiff received a warning from Amy Larocque because she had not submitted a "PCR test".

**42.** On June 13th, 2022, the plaintiff had a meeting with several HR representatives and her manager Sarah Guadagno to discuss her taking a leave of absence for medical reasons.

**43.** On June 15th, 2022, while out of the office on leave, the plaintiff received an email from Clarisse Wood (HR) who clarified that the plaintiff was not only being required to "test", but also required to get a "COVID vaccine" or her employment would be terminated for cause.

**44.** On August 22nd, 2022, the plaintiff returned to work from medical leave. Prior to return, she received an updated, unsigned communication from the defendant's

"Accommodations Team" with updated termination dates if she did not comply with the company's COVID testing and vaccination mandates. The plaintiff was told that she had to attest to taking two Covid-19 antigen tests weekly up to the given deadline to become "fully vaccinated" through an online "Smartsheet" in order to reactivate her badge so she could enter the office building.

**45.**     On August 30th, 2022, the plaintiff confirmed that her badge was still deactivated.

**46.**     All written communication attached as Exhibit A.

### COUNT I -- COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA-AA

**47.**     Plaintiff re-alleges each of the pertinent statements from paragraphs 1 to 46 and those in her affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

**48.**     The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

**49.**     Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, the plaintiff is proceeding under the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon the defendant to prove that it qualified for an exemption or exception to its legal duties to comply with the ADA. These are further expressed in this complaint.

**50.**     This is also a case of first impression because, regarding the defendant's "Covid-19 Policy", the plaintiff has exercised her rights to medical privacy and informed consent to refuse medical treatments. These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630.14(c) and (d) for the reason that these rights are <u>intangible private property rights</u> of people, and of the plaintiff specifically, and are protected by law and not originated or granted by any statute. These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

**51.**     This is also a case of first impressions because the plaintiff was the first one to use the ADA to protect her rights and asked the question: how did the defendant suddenly

acquire a new legal authority or legal duty to treat the plaintiff for a disease without any medical examination or diagnosis? The answer of course is that the defendant never did acquire any such legal duty or authority.

52.    This is also a case of first impressions because, while the defendant makes the noble-sounding but disingenuous claim that its "Covid-19 Policy" is intended to prevent the spread of Covid-19, they have absolutely no financial responsibility to engage in or administer such a policy. In fact, many employers adopt such policy for the entirely ulterior motive of qualifying for the government's disaster relief funds.

53.    This case, for the first time, requires answers for the following three questions: (1) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with Covid-19 after complying with its "Covid-19 Policy"? (2) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy"? And (3) Why has the United States District Court itself adopted the same policies as the defendant and, therefore, how can the court be impartial?

54.    Once again, this is a case of first impressions because, if the defendant actually had the *bona fide* legal right to require the plaintiff to disclose her medical records, then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and then request such records directly from her physician. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order. Instead, the defendant's "Covid-19 Policy" depends solely upon the employee to voluntarily waive her rights to medical privacy and disclose such records.

55.    The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as Covid-19, which has been said to cause a global pandemic since January, 2020.

56.    Although the plaintiff is not required by law to discuss the nature of such disability, for clarity's sake she alleges that the defendant's policy rested on the assumption that every

employee, the plaintiff included, had or could have this disease. That is, the policy's underlying assumption was that all of its employees were simultaneously at risk and posed a risk to the health of all other employees.

57.   One of the mitigation measures established by the defendant's "Covid-19 Policy" is a vaccination mandate. On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no exemption.

58.   The defendant's "Covid-19 Policy" regarded the plaintiff as having Covid-19 or being prone to getting infected with Covid-19 because she is not vaccinated.

59.   It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of Covid-19.

60.   This policy was inherently based upon the unproven presumption that the plaintiff had such a disability and the pure speculation that someday the plaintiff might become infected with such disease. The defendant also assumes that its policy was the proper treatment to mitigate its effects in the workplace.

61.   The defendant's "Covid-19 Policy" imposed certain medical treatments, including but not limited to experimental vaccines, wearing a surgical mask over the face, social distancing, segregation, isolation, disclosing medical records and medical history, and submitting to medical examinations. These are each well-known medical treatments that invoke the plaintiff's medical privacy rights and as explained previously, which are squarely rooted in the ADA.

62.   The defendant's "Covid-19 Policy" classified the plaintiff in such a way that her employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do her job without first submitting to defendant's accommodations ("mitigation measures").

63.   The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

64.     The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

65.     The vaccines demanded by the defendant were experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and because none of the experimental vaccines had been approved by the Food and Drug Administration. Some may have been "authorized", but only one was approved and is not commercially available, even if the plaintiff chose to take it.

66.     Simply, there are no proper and safe vaccines. In addition, if a vaccine prevents infection and transmission of a disease as defined by modern scientific standards, why would anyone need to take a vaccine so that someone else could avoid becoming ill? A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

67.     And if there was such a vaccine, why did employees who were concerned simply take the vaccine themselves? Since when does one take a medical treatment so that someone else will not become ill?  This is not even sane.

68.     In fact, this practice, regarding oneself and others as having an illness without any diagnosis, and then seeking to treat everyone with the same medical intervention without any diagnosis, is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health. The defendant's "Covid-19 Policy" demonstrates that those seeking to impose it upon employees and the plaintiff are suffering from an un-diagnosed mental illness and have demonstrated that each of them are a danger to themselves and others and must be ordered to submit to an involuntary mental evaluation. The plaintiff's allegations easily satisfy the elements of discrimination by showing that she falls within a protected group, that she was qualified for the position she held, that she was subject to an adverse employment action and that the adverse employment action was taken under the circumstances giving rise to the facts which constitute unlawful discrimination.

69.     The defendant's "Covid-19 Policy" fails to include any provisions for: (1) employees with disabilities; and (2) protecting the medical privacy of employees, and specifically the

plaintiff's.

**70.**     The defendant's "Covid-19 Policy" fails to include any provisions establishing that the plaintiff waived her rights to medical privacy, to informed consent or her rights protected under the ADA.

**71.**     The defendant's "Covid-19 Policy" is applied disproportionately by identifying groups of employees, such as those who are "vaccinated" and those who are "unvaccinated". It ignores the group of employees who invoke their rights under the ADA and further identifies another group of employees who claim to be exempted from such policy for medical or religious reasons.

**72.**     The plaintiff is within the group of employees who has invoked rights under the ADA and is treated differently by the defendant than the other groups, such as those who defendant considers "vaccinated" and then "unvaccinated" and those requesting "exemptions for medical or religious reasons".

**73.**     While it is not necessary to allege that the defendant regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose its provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that she was infected or may in the future become infected with a deadly contagious disease (e.g. Covid-19) and that the defendant acquired the legal duty and legal authority to cure or treat such disability by imposing measures upon the plaintiff.

**74.**     The defendant claimed that its "Covid-19 Policy" was a requirement, but it failed to act under any legal authority or legal duty to impose its policy measures on its employees.

**75.**     The defendant's "Covid-19 Policy" was not supported by a legal duty with which the plaintiff was required to comply. Actually, the plaintiff was protected under the ADA upon giving notice to the defendant that she was a qualified individual who was being regarded as having a disability. Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory.

**76.**     The defendant disingenuously denies regarding the plaintiff as having a disability,

even though the plaintiff had given defendant sufficient notice that she is regarded as having a disability.

**77.**   The defendant claims that they are simply following the law or regulations or policies; however, none of the Covid-19 policies have created any new legal duty upon the defendant, nor given the defendant any new legal authority. There is no such law.

**78.**   The defendant's "Covid-19 Policy" openly claims that it is intended to "prevent the spread of Covid-19", described a deadly contagious disease, and then outrageously, acts as if everyone is infected with it and must consequently submit to the same exact medical treatments without any professional examination, diagnosis, supervision, or judicial approval or oversight.

**79.**   To this day, the defendant has not identified any authority or legal duty it has to impose its non-job related policy.

**80.**   To this day, the defendant has failed to demonstrate that they met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

**81.**   To this day, the defendant has failed to demonstrate that they had any financial responsibility to either protect anyone, including the plaintiff, from a purportedly deadly contagious disease or that it had any financial responsibility to anyone suffering adverse health consequences from participating in its "Covid-19 Policy" measures, namely, taking experimental vaccines during an emergency use authorization (EUA) period.

**82.**   The defendant made false claims that its "Covid-19 Policy" was voluntary and yet imposed pecuniary measures and other adverse employment actions as a direct and proximate cause of the plaintiff's good faith refusal to participate or accept such provisions(i.e. the "Covid-19 Policy").

**83.**   The defendant's adverse employment actions included, but were not limited to, segregating and isolating its employees and asking them to work from home, and thus preventing her from doing her normal employment duties; compelling her to submit to various medical interventions such as wearing masks over her face and getting "PCR" tests;

requiring her to get vaccinated as a new condition of employment, and threatening her with terminating her employment. Actually, the defendant admitted that non-compliance with the vaccination mandate would result in termination of the plaintiff's employment.

84.    Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[2] medical examination history) and without any regard to confidentiality. The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

85.    The plaintiff is not required to request exemptions from the defendant's "Covid-19 Policy" for religious or medical reasons and in fact, is not required to request any accommodations or reasonable modifications regarding such policy because none of its provisions are related to her essential job function.

86.    Likewise, the defendant has failed to give conspicuous notice as to the manner in which such policy is related in any way to the plaintiff's essential job function.

87.    Furthermore, the defendant's policy, which itself demonstrates that the defendant certainly regards the plaintiff as having Covid-19, a disability that is covered by the ADA, illegally fails to include any provision for those employees with disabilities.

88.    Defendant fails to provide any advice or instruction on how to conduct any individualized assessment[3] for those employees claiming rights under the ADA, and fails to identify any ADA representative of the defendant. In fact, the defendant's "Covid-19 Policy" completely ignores its legal duties to aid and encourage those with disabilities under the ADA.

89.    Ironically, the defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform her essential job functions as the policy itself creates a physical impairment that

---

2    Polymerase Chain Reaction
3    EEOC Technical Manual 2.2 (c)  "...the Supreme Court has stated and the Congress has reiterated, "society's myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairments."  The legislative history of the ADA indicates that Congress intended this part of the definition to protect people from a range of discriminatory actions based on "myths, fears and stereotypes" about disability, which occur even when a person does not have a substantially limiting impairment."

substantially limits the plaintiff's ability to engage in one or more major life activities, one of which includes "working". This is not the sole impairment the plaintiff is alleging.

90.    The fact is that the <u>defendant made a record of the impairment its policy is intended to treat</u>, by documenting plaintiff's "vaccination status" even though she refused to disclose her medical records, and via its communication, attitude and treatment of the plaintiff.

91.    The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

92.    The fact that the defendant applied the policy to everyone equally fails to recognize that the plaintiff, after giving notice of being regarded as having a disability and objecting to submit to the defendant's "accommodations", was within a protected class and engaged in a protected activity and therefore, not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. This is the same as in the example of the defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination. *Everyone was required to use the stairs and the policy is applied equally to everyone*, is the erroneous conclusion here.

93.    The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which such accommodations in its "Covid-19 Policy" were related to her essential job function.

94.    In fact, none of the accommodations were related to the plaintiff's essential job function because she was able to continue performing her essential employment duties without participating in the defendant's "Covid-19 Policy".

95.    Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

96.    The plaintiff was deceived into requesting a "religious exemption" which was not a meaningful accommodation. In fact, it was intended solely to give the appearance of

fairness because it was never seriously considered and the defendant never disclosed any qualifying criteria for such "exemption" nor the legal duty from which the plaintiff was being "exempted" as the defendant's policy did not impose any new legal duties upon the plaintiff from which she could have been exempted.

97.     Instead, the defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

98.     The defendant simply punished the plaintiff for her refusal on the pure speculation that the plaintiff had a disability known as Covid-19, or on the pure speculation that someday she might have such a disease, and on the false premise that the defendant had the legal duty and authority to protect her and everyone else from contracting such a disease (disability).

99.     The defendant proceeded to segregate and isolate the plaintiff, thereby causally resulting in the plaintiff's loss of opportunities of career advancement and team-building opportunities. The defendant also caused the plaintiff physical and emotional distress.

100.    Claiming that the plaintiff had a deadly contagious disease, or that she might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and Parts 1630.14(c) and (d).

101.    The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

102.    The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered its normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter its normal operations.

103.    The defendant failed to identify or describe any set of facts establishing that the disability its policy was intended to prevent was both transitory and minor.

104.    The defendant failed to establish any set of facts that proved that the Covid-19

disease is transitory because it is said to have created a world-wide pandemic that began at the end of the year 2019 and continues to this day, including the "variations" (strains) and the so-called "long Covid" and "short Covid", all based upon the claim that these are and have been since the end of 2019, deadly contagious diseases.

**105.** The defendant cannot now claim that such disability is "transitory", especially since they are not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

**106.** The defendant cannot rely upon news or public announcements to determine that the plaintiff individually has any type of disability since that would require a *bona fide* medical examination and diagnosis by a physician.

**107.** The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once she gave notice that she was a qualified individual with a disability and that she was regarded as having a disability, and once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment, the treatment or cure for which was the defendant's "Covid-19 Policy".

**108.** The defendant mis-classified the plaintiff as having a deadly contagious disease (impairment) by imposing its "Covid-19 Policy" upon her as a new condition of employment, and made a record of such disability by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

**109.** It is the defendant's policy that demonstrated that the defendant regarded the plaintiff as disabled because of the plaintiff's unvaccinated status.

**110.** The plaintiff is entitled to the protections established in the ADA under the second and third prongs ("regarded as" "record of").

**111.** The defendant's "Covid-19 Policy" assumes that unvaccinated employees have a contagious disease that affects their respiratory system (a major bodily function) or else, that because they remain unvaccinated, they have a suppressed or weak immune system that makes them vulnerable to Covid-19 and a threat to other employees.

112.   The defendant conducts no individualized assessment to determine the existence of the disability or the "dangerousness" of the presence of the unvaccinated employees in the workplace.

113.   Ironically, it is the defendant's "Covid-19 Policy" itself that creates a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, including working and interacting with others.

114.   The defendant made a record of such disability by classifying the plaintiff as "unvaccinated". The defendant, by its own policies, attitude toward the plaintiff and means of communication, record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA known as the "record of" prong.

115.   The plaintiff was never required to discuss the nature of such disability and because such disability was not job related and the plaintiff was not requesting reasonable modifications, again, she was therefore not required to discuss the nature of such disability no more than she was required to participate in the defendant's "Covid-19 Policy".

116.   Not only the defendant's "Covid-19 Policy" is not rational, and not implemented with any legal authority or duty whatsoever—there is no rational basis to act as if every single member of a community (e.g., all employees of the defendant) suddenly have the same exact illness (which constitutes a disability) and that without any individualized examination, everyone would benefit from the same exact medical treatment.

117.   It is irrational that non-skilled and unlicensed individuals should impose such interventions upon everyone at the same time because of some commentary on a website (e.g., CDC, EEOC, etc.) that states, that type of policy will prevent a disease, while such websites simultaneously disclaims such commentary as valid legal or medical advice.

118.   The defendant's policy was based purely upon the speculation, generalization and stereotype that everyone was infected with Covid-19 and that the defendant suddenly had the legal duty and authority to protect every employee, in spite of the fact that it had no financial responsibility, either to protect anyone from any deadly contagious disease, or to compensate anyone suffering any adverse health consequences from participating in its

"Covid-19 Policy" or taking experimental vaccines or other treatments.

**119.**   The plaintiff identified herself as being within a protected group and engaged in a protected activity upon giving the defendant notice that she was regarded as having a disability and that she was a qualified individual with a disability and then refusing the defendant's accommodations based upon her good faith belief.

**120.**   The plaintiff also alleged that she was qualified for the job and both willing and able to continue performing her employment duties and that the defendant's "Covid-19 Policy" was not related in any way to plaintiff's essential job functions.

**121.**   And that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

**122.**   Beginning from the moment plaintiff gave such notice to the defendant, the plaintiff suffered adverse employment actions when the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff, ignored and denied her claim of disability and continued reprimanding her, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and continuously threatening to terminate her employment.

**123.**   The plaintiff demands a jury trial.

**124.**   WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) compensatory damages in whatever amount plaintiff is found to be entitled; (iii) an equal amount as liquidated damages, other monetary damages; (iv) an award of costs and reasonable court fees; and (v) punitive damages to the extent available; (vi) pre-judgment and post-judgment interest; and (vii) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

### COUNT II. COMPLAINT FOR RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

**125.**   The plaintiff sues the defendant for retaliation in violation of the ADA and the ADA-AA.

**126.**   The plaintiff re-alleges the foregoing statements of fact and allegations from her complaint for discrimination in Count I along with her affidavit, and further alleges the following.

## ALLEGATIONS

**127.**   Plaintiff re-alleges each of the pertinent statements from paragraphs 1 to 46 and those in her affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

**128.**   Upon giving defendant notice that she was regarded as having a disability and that she was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures and adverse employment actions, upon her for her good faith refusal to participate in the defendant's offered accommodations.

**129.**   Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying her rights under the ADA,  specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**130.**   The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**131.**   The plaintiff exercised her right to refuse the defendant's "Covid-19 Policy" measures based upon a good faith belief that the policy did not apply to her because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**132.**   Exercising this right was a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because she had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**133.**   The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the policy was not

related in any way to her essential job function.

**134.**   The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to her essential job function.

**135.**   The defendant imposed pecuniary measures, adverse employment actions, upon plaintiff which included the loss or threatened loss of pay, isolation, segregation from her employment.

**136.**   Each time the plaintiff exercised her right to refuse the defendant's accommodations, she did so in good faith, and the defendant subsequently and either immediately or in a manner that was causally related to the exercise of such right, imposed adverse employment actions upon the plaintiff, including but not limited to segregating and isolating its employees and asking them to work from home, and thus preventing her from doing her employment duties in her accustomed setting; compelling her to submit to various medical interventions such as wearing masks over her face and getting "PCR" tests; requiring her to get vaccinated as a new condition of employment; excluding her from career advancement opportunities and team-building activities, and threatening to terminate her employment, but not for any necessary reasons other than as an adverse employment action intended to punish her for exercising her rights.

**137.**   The defendant imposed these measures in a direct causally related manner upon the plaintiff each time she exercised her rights to refuse to participate in the defendant's "Covid-19 Policy".

**138.**   The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, comparing the way it used to be before July of 2021 to the way it has become by the defendant's implementation of its "Covid-19 Policy".

**139.**   These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which she was able to do her job and interact with co-

workers and substantially impaired her ability to perform her essential employment duties, and was the direct and proximate cause behind the plaintiff's loss of face-to face interactions with superiors, colleagues, direct reports and team-building opportunities.

**140.**   As a direct and proximate cause of plaintiff exercising her rights under the ADA to refuse in good faith the defendant's "Covid-19 Policy" measures, the defendant prevented the plaintiff from working on the premises and isolated her from other employees.

**141.**   Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations, and each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**142.**   Each adverse employment action took place within moments of, and in direct response to, plaintiff's expression of her good faith refusal to comply with the defendant's policy.

**143.**   While the defendant ignorantly and illegally ignored its actual legal duties, the defendant made a record of such disability by mis-classifying the plaintiff as having an impairment that substantially limited one or more major life activities, including but not limited to thinking, working, eating, breathing, walking, communicating and others expressed in the ADA itself, but not limited thereto.

**144.**   The defendant made such a record by adding the plaintiff's name to a list of employees who were "unvaccinated" and then keeping an actual record of the same, and by adopting its written "Covid-19 Policy" and by its attitude toward the plaintiff and the manner in which the defendant interacted and communicated with the plaintiff.

**145.**   It is not relevant whether or not the defendant denies regarding the plaintiff as having a disability, the fact is that she was regarded as having a disability, at least by the government and as demonstrated by defendant's policies, irrespective of the defendant's bad faith and contradictory denial of the same.

**146.**   These facts demonstrate the defendant's adverse employment actions derived from its "Covid-19 Policy" and its failure to comply with the ADA in fact constituted a materially

adverse change in the terms and conditions of employment.

**147.**   Before the policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its "Covid-19 Policy", all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of her right to refuse.

**148.**   These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties. These changes included (actual or likely) termination of employment, isolation, and loss of benefits and were each causally related to each time the plaintiff chose to exercise and enjoy her rights under the ADA.

**149.**   Ultimately, the defendant did threaten to terminate the plaintiff's employment as a direct and proximate cause of her refusal to participate in the defendant's "Covid-19 Policy".

**150.**   The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy". The defendant was aware of plaintiff refusal from the very moment she expressed that she was regarded as having a disability and began refusing to participate in its policy.

**151.**   Each time the defendant approached the plaintiff with a demand or request to submit to the terms of its "Covid-19 Policy", the defendant informed the plaintiff that she would be penalized, such as the plaintiff has previously alleged.

**152.**   The plaintiff demands a jury trial.

**153.**   WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) compensatory damages in whatever amount plaintiff is found to be entitled; (iii) an equal amount as liquidated damages, other monetary damages; (iv) an award of costs and reasonable court fees; and (v) punitive damages to the extent available; (vi) pre-judgment and post-judgment interest; and (vii) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this _02_ day of September, 2022.

Susanna Librandi,
Plaintiff in *propria persona*